DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Roy L. Buchanan has appealed from his conviction and sentence in the Lorain County Court of Common Pleas. This Court affirms.
 I {¶ 2} On February 27, 2002, Defendant-Appellant Roy L. Buchanan was indicted on one count of rape in violation of R.C.2907.02(A)(2), a felony of the first degree. Appellant entered a "not guilty" plea to the indictment on March 6, 2002. On October 30, 2002, a supplemental indictment was filed charging Appellant with five additional counts of rape in violation of R.C.2907.02(A)(1)(b), all felonies of the first degree, and five counts of gross sexual imposition in violation of R.C.2907.05(A)(4), all felonies of the third degree. On November 7, 2002, Appellant entered "not guilty" pleas to the charges in the supplemental indictment.
 {¶ 3} A jury trial commenced on February 3, 2005. Prior to the presentation of arguments and evidence, the supplemental indictment was amended to reflect the law at the time of the offense; accordingly, the five additional rape counts were aggravated felonies of the first degree. Also, the dates in all the counts of the supplemental indictment were amended to June 13, 1991 through June 12, 1995, so that the alleged offenses occurred before the victim's 13th birthday. The State also amended the original rape count to contain the timeframe of June 13, 1995 to June 14, 1997. On February 7, 2005, Appellant was found guilty on all counts of the indictments. Appellant was sentenced on June 1, 2005. The trial court imposed the following terms of incarceration: five to twenty-five years in prison for each of the six rape convictions, to be served consecutively to each other, and one year in prison for each of the five gross sexual imposition convictions, to be served concurrently to each other. The gross sexual imposition sentences were ordered served consecutively to the rape sentences.
 {¶ 4} Appellant has timely appealed his convictions and sentences, asserting three assignments of error.
 II Assignment of Error Number One
"THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN VIOLATION OF CRIMINAL RULE 29 ARTICLE 1 SECTION 10 OF THE OHIO CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES WHEN IT DENIED APPELLANT'S MOTION FOR ACQUITTAL."
 {¶ 5} In his first assignment of error, Appellant has argued that the trial court erred in denying his motion for acquittal. Specifically, Appellant has argued that the State did not provide sufficient evidence to establish the elements of the crimes charged.
 {¶ 6} To preserve the denial of a Crim.R. 29(A) motion for appellate review, a defendant must make a timely motion for acquittal. State v. Roe (1989), 41 Ohio St.3d 18, 25. Additionally, a "defendant who is tried before a jury and brings a Crim.R. 29(A) motion for acquittal at the close of the state's case waives any error in the denial of the motion if the defendant puts on a defense and fails to renew the motion for acquittal at the close of all the evidence." (Quotations omitted.) State v. Jaynes, 9th Dist. No. 20937, 2002-Ohio-4527, at ¶ 7.
 {¶ 7} After a careful review of the record, we find that Appellant has waived any objection to the sufficiency of the evidence. The trial transcript and docket show that at the close of the State's case Appellant moved for acquittal pursuant to Crim.R. 29(A). The trial court denied Appellant's motion and Appellant testified on his own behalf. After resting, however, Appellant failed to renew his Crim.R. 29 motion for acquittal. The State then called one rebuttal witness. At the conclusion of rebuttal testimony, Appellant again failed to renew his motion for acquittal. Therefore, Appellant has waived any challenge to the court's denial of his motion for acquittal.
 {¶ 8} Based on the foregoing, Appellant's first assignment of error lacks merit.
 Assignment of Error Number Two
"THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT WHEN IT ENTERED JUDGMENT OF CONVICTION, WHERE SUCH JUDGMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 9} In his second assignment of error, Appellant has argued that his convictions were against the manifest weight of the evidence. Specifically, he has argued that unreliable testimony and conflicts in the evidence show that his convictions were not supported by a manifest weight of the evidence. We disagree.
 {¶ 10} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 11} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. Karchesv. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten,33 Ohio App.3d at 340.
 {¶ 12} Appellant was convicted of six counts of rape. Pursuant to R.C. 2907.02(A)(2), the first rape count:
"No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
The remaining five rape counts were under R.C.2907.02(A)(1)(b), which provides:
"No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:
"* * *
"(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."
Appellant was also convicted of five counts of gross sexual imposition. Pursuant to R.C. 2907.05(A)(4):
"No person shall have sexual contact with another, not the spouse of the offender * * * when any of the following applies:
"(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."
 {¶ 13} Appellant has argued that his rape and gross sexual imposition convictions were against the manifest weight of the evidence. The State has argued that the evidence supported the convictions. We agree with the State.
 {¶ 14} During the trial, K.Y., the alleged victim, testified to the following for the State. She was born June 13, 1982 and was currently 22. Appellant dated K.Y.'s mother when K.Y. was a child. Appellant moved in with K.Y. and her family at a home on West 23rd Street when K.Y. was nine. Appellant looked after K.Y. and her brother and she considered him more of a father than her biological father. K.Y. testified that she still loved Appellant.
 {¶ 15} K.Y. testified that her mother worked the graveyard shift, 11 p.m. to 7 a.m., so Appellant would watch her and her younger brother. Appellant did not work, but was able to contribute financially from his military service pension. K.Y. testified that the first time something "uncomfortable" happened was when Appellant was baby-sitting her when she was nine or ten and they were living at the West 23rd Street house. K.Y. was asleep, woke up, and went downstairs to get something to drink. Appellant was awake downstairs drinking "Irish Rose" wine. K.Y. testified that she was still able to smell the wine. When asked why she was testifying with her eyes closed, K.Y. testified that she was still able to see the events with her eyes closed.
 {¶ 16} K.Y. continued testifying to the following. After she got something to drink, Appellant asked her to go to him and she said no. She testified that she didn't want to go to him because it was dark and she didn't know why he wanted her to go to him. Appellant tried to grab K.Y. and she ran away from him. K.Y. testified that Appellant chased her around a coffee table about three or four times and then he somehow ended up on top of her. Appellant was laying on top of K.Y. to prevent her from going upstairs; K.Y. was on her stomach and Appellant was laying on top of her back. K.Y attempted to get away by kicking and calling for her brother, but she couldn't get away; she distinctly remembers "sucking up the carpet" with her mouth as she attempted to get free. While she was trying to get away, Appellant "stuck his hand in [her] underwear" and "scratched [her] private." K.Y. was crying by this point and Appellant let her go and she went upstairs and cried herself to sleep. K.Y. didn't tell anyone what had happened.
 {¶ 17} K.Y. testified that after that night she performed oral sex on Appellant 10 or 15 times before the family moved to Riverside Drive; these events occurred over the course of two years, when K.Y was 10-12 years old. Appellant would call her name and then "guide [her] hand to his private." Appellant performed oral sex on her "maybe twice." During this two-year period, Appellant and K.Y. engaged in oral sex a total of 20-30 times and he touched her "over a hundred times." K.Y. testified that she didn't tell anyone about what Appellant did because: "It was our secret. He told me not to tell anybody and that he loved me and he would do anything for me and my mother."
 {¶ 18} K.Y. also testified to an event at their house on Riverside Drive when she was around 13 years old. While K.Y.'s mother was at work, Appellant entered K.Y.'s room, "guided" her to her mother's room, and Appellant and K.Y. performed oral sex on each other simultaneously. It was Appellant's idea to perform the acts on each other simultaneously. K.Y. testified that Appellant's shirt was off and she unbuckled his pants after he guided her hand "to his private and that was just how [they] started." K.Y. asked Appellant why they couldn't have intercourse and he told her he didn't want her to get pregnant. K.Y. testified that Appellant's answer "kind of hurt my feelings * * * [b]ecause I couldn't see why I had to do oral sex and we couldn't have intercourse." When asked if she was a willing participant in some of the acts with Appellant K.Y. answered: "As I got — when I was younger, I mean, I just didn't know what to do, but as I started to get used to it, I sort of kind of liked it."
 {¶ 19} After K.Y. turned 13 she performed oral sex on Appellant "maybe twice" and he performed it on her two or three times; during those incidents he also digitally penetrated her "maybe" twice. K.Y. then started to have her own boyfriends, got a part-time job, and stayed away from the house when her mother was at work. Appellant would question her about her activities and he told her not to become a "cum bucket" for boys.
 {¶ 20} K.Y. described the difference between a circumcised penis and an uncircumcised penis and testified that Appellant was uncircumcised. She also testified that he slept naked.
 {¶ 21} K.Y. testified that the first person she told about what Appellant did was her friend Lissa. They were talking and Lissa "made a comment about if [Appellant] had ever tried anything" and K.Y. told her everything. Lissa told K.Y. she should tell her mother, but she wasn't ready to, so she waited about a year.
 {¶ 22} K.Y. told her mother what Appellant did and her mother immediately kicked Appellant out of the house. Appellant repeatedly asked why he was being kicked out. K.Y.'s mother told him why and he asked K.Y. what he did. Appellant asked her again and then asked why she was doing this to him. K.Y. has never sued Appellant for his actions or attempted to obtain money from him. The following colloquy occurred at the end of the State's questioning:
State: "Is [Appellant] the same man that held you down in the living room when you were nine to ten years old?
K.Y.: "Yes.
State: "Is [Appellant] the same man that made you perform oral sex upon him when you were under the age of 13 on 10 to 15 occasions? K.Y.: "Yes.
State: "Is [Appellant] the same man that had you do a 69 on Riverside Drive when you were 13?
K.Y.: "Yes."
 {¶ 23} K.Y. testified to the following on cross-examination. Appellant drank five out of the seven days in a week and when he drank he drank a lot. About two days after the first incident, Appellant took K.Y.'s hand and put it on his penis; the extent of the activity progressed each time. K.Y. still loves Appellant and still considers him a father figure. She testified that he would still do anything for her and her family.
 {¶ 24} On re-direct, K.Y. testified that her testimony was truthful and that what she described did happen.
 {¶ 25} Cathy Young ("Young"), K.Y.'s mother, testified to the following. She has known Appellant for probably 15 years and he used to live with her and her family. Appellant would baby-sit Young's children while she worked the third shift at Marconi's. Appellant was a father figure to Young's children and Young was comfortable leaving them with him. Young did however, have issues with Appellant talking to K.Y. about boys because she didn't like the way he phrased his comments. For example, Young testified that she didn't like when Appellant told K.Y. not to become a "cum bucket" and not to lay with boys. Young remembered asking K.Y. if Appellant ever touched her and that if he did K.Y. could tell her; K.Y. did not tell her about the abuse until she was 17 or 18 years old. Young also testified that Appellant was uncircumcised and slept naked.
 {¶ 26} Young testified to the following on cross-examination. When she asked K.Y. if Appellant ever came into her room or anything, K.Y. answered no and said that she would tell her if he did. Young testified that K.Y. told her what Appellant did after hearing that her younger brother said Appellant had "bumped his booty[.]" Young kicked Appellant out of her house after K.Y. told her what happened.
 {¶ 27} Lissa G. Lovett ("Lissa") testified to the following for the State. Lissa has been friends with K.Y. for almost six years. When K.Y. told Lissa what happened with Appellant, Lissa told her to tell her mother and possibly get some counseling. Lissa observed K.Y. around Appellant and noticed that K.Y. looked very uncomfortable and did not speak when he spoke to her.
 {¶ 28} After Lissa testified, the State rested its case. Appellant made a Crim.R. 29 motion and the trial court denied the motion. Appellant then presented his defense.
 {¶ 29} Appellant testified on his own behalf and testified to the following. He met Young and later moved in with her and her family; he also helped her financially. He denied ever touching K.Y. and thinks she was influenced by others to say he did. Appellant denied every instance of abuse described by K.Y. He also had no idea how K.Y. knew he was uncircumcised, in fact, Appellant seemed confused on the issue of if, he was in fact, uncircumcised.
 {¶ 30} When asked if it was possible that he was drunk and did something to K.Y., Appellant denied ever having sex with K.Y. Appellant also denied talking to K.Y. about boys and sex. He specifically denied telling K.Y. not to become a "cum bucket." Appellant testified that he has remained in contact with Young since she kicked him out of the house.
 {¶ 31} Appellant testified that he did not remember K.Y. ever performing oral sex on him and that it never happened. Appellant remembered telling a detective that he normally sleeps in the nude. Appellant also testified that he told the detective he believed K.Y. was an honest person in the community.
 {¶ 32} On cross-examination, Appellant testified that he did not recall specifically telling the detective that he did not "remember" if K.Y. performed oral sex on him rather than saying K.Y. "did not" perform oral sex on him. Appellant testified that saying something did not happen and saying you don't remember it happening are the same things.
 {¶ 33} After Appellant testified the defense rested its case and the State called one rebuttal witness.
 {¶ 34} Detective Steyven Curry of the Lorain Police Department testified to the following for the State. Det. Curry spoke to Appellant about the sexual abuse allegations concerning K.Y. and her younger brother. When asked about "bumping" K.Y.'s younger brother's booty Appellant denied any such activity; those allegations were later deemed unsubstantiated. Appellant provided a different response when asked about the allegations concerning K.Y.
 {¶ 35} When Det. Curry asked Appellant about oral sex with KY., Appellant could not recall if it happened. He simply couldn't remember; to be clear, Appellant did not admit any criminal behavior, he simply couldn't remember.
 {¶ 36} Det. Curry testified to the following on cross-examination. Appellant voluntarily came to the police station to be interviewed and called Det. Curry on more than one occasion concerning the matter. Appellant never admitted to having any kind of a sexual relationship with K.Y.
 {¶ 37} On re-direct examination, Det. Curry testified that during the interview Appellant never denied having a sexual relationship with K.Y. Appellant never called K.Y. a liar, he merely repeatedly stated that he could not remember if she performed oral sex on him.
 {¶ 38} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the jury clearly lost its way when it found Appellant guilty of six counts of rape and five counts of gross sexual imposition. The jury was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony. See Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Although K.Y. did not testify to the exact number of times certain sexual acts occurred and their corresponding dates, she clearly testified to her age during the acts and to enough acts to support the convictions. While not an exhaustive list, we found the following testimony relevant in deciding that Appellant's convictions were not against the manifest weight of the evidence: K.Y.'s testimony that she considered Appellant a father figure and still loved him; K.Y.'s testimony about Appellant pinning her down, laying on top of her in her living room, and engaging in sexual conduct with her "private" when she was nine or ten years old; her testimony about performing oral sex on Appellant over 10 times before she was 13 years old; her testimony concerning how the sexual encounters began; K.Y.'s testimony describing touching Appellant's penis and how he touched her over 100 times before she was 13 years old; her testimony recalling when she was around 13 years old and Appellant entered her bedroom, guided her to her mother's room, guided her hand to his penis, and "had her" engage in simultaneous oral sex; K.Y.'s testimony about oral sex incidents after she turned 13 and Appellant digitally penetrating her during those incidents; and her intimate knowledge of Appellant's anatomy.
 {¶ 39} Contrary to Appellant's argument, his convictions were not against the manifest weight of the evidence simply because the jury chose to believe the evidence of Appellant's guilt offered by the prosecution. State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Furthermore, the jury, as the fact finder, was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported the conviction of Appellant. SeeDeHass, supra. Making every reasonable presumption in favor of the judgment, we cannot find that the record weighs heavily against the convictions.
 {¶ 40} Based on the foregoing, Appellant's second assignment of error lacks merit.
Assignment of Error Number Three
"THE TRIAL COURT ERRED BY NOT ORDERING MINIMUM CONCURRENT SENTENCES AND SENTENCING APPELLANT TO SEVEN CONSECUTIVE SENTENCES."
 {¶ 41} In his third assignment of error, Appellant has argued that the trial court erred when it sentenced him. Specifically, Appellant has argued that he should have received minimum concurrent sentences, not consecutive sentences. We disagree.
 {¶ 42} The trial transcript shows that Appellant was sentenced under the pre-Senate Bill 2 sentencing guidelines. Effective July 1, 1996, R.C. 2929.11 was amended by Am.Sub.S.B. No. 2. The Ohio Supreme Court found that "[t]he amended sentencing provisions of S.B. 2 apply only to those crimes committed on or after July 1, 1996." State v. Rush (1998),83 Ohio St.3d 53, 58. Accordingly, we review Appellant's sentence under the former version of R.C. 2929.
 {¶ 43} This Court reviews the trial court's sentence under R.C. 2929 under the abuse of discretion standard of review.State v. Canfield, 9th Dist. No. 03CA0078-M, 2004-Ohio-2123, ¶ 6. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. Under the pre-Senate Bill 2 version of R.C. 2929, an appellate court would generally not reverse the trial court's sentence if the sentence was authorized by statute and was within the statutory limits. Statev. Hill (1994), 70 Ohio St.3d 25, 29.
 {¶ 44} Appellant has argued that the trial court erred in sentencing him to consecutive terms of imprisonment rather then concurrent terms. Pursuant to the pre-Senate Bill 2 R.C. 2929.41:
"(A) Except as provided in division (B) of this section, a sentence of imprisonment shall be served concurrently with any other sentence of imprisonment imposed by a court of this state[.]
"(B) A sentence of imprisonment shall be served consecutively to any other sentence of imprisonment, in the following cases:
"(1) When the trial court specifies that it is to be served consecutively[.]"
Both the sentencing transcript and the sentencing journal entry ordered that the sentences for Appellant's six rape convictions were to be served consecutively to each other and that his concurrent gross sexual imposition sentences were to be served consecutively to the rape sentences.
 {¶ 45} After reviewing the applicable sentencing statute, the sentencing transcript, and the sentencing journal entry, we cannot find that the trial court abused its discretion in sentencing Appellant to consecutive sentences. It is clear from the record that the trial court acted within its discretion when it sentenced Appellant and that its attitude was not unreasonable, arbitrary, or unconscionable. Accordingly, Appellant's third assignment of error lacks merit.
 III {¶ 46} Appellant's three assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Carr, J. Boyle, J. concur