DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Milton Banks, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} In March 2005, Appellant was arrested and charged in the Cuyahoga Falls Municipal Court with attempted murder, in violation of R.C. 2903.02/2923.02, a first-degree felony. The case was subsequently bound over to the Summit County Grand Jury. On April 13, 2005, the Summit County Grand Jury indicted Appellant on one count of attempted murder, in violation of R.C.2923.02/2903.02(A), a first-degree felony, with a firearm specification in violation of R.C. 2941.145; one count of felonious assault, in violation of R.C. 2903.11(A)(2), a second-degree felony, with a firearm specification in violation of R.C. 2941.145; and one count of aggravated menacing, in violation of R.C. 2903.21, a first-degree misdemeanor. Appellant pled not guilty to the charges.
 {¶ 3} The matter proceeded to a jury trial. At the close of the presentation of the State's case, the court entered a "directed verdict" on the aggravated menacing charge, finding Appellant not guilty. A jury found Appellant not guilty of the attempted murder count, but found him guilty of felonious assault with the firearm specification. The trial court sentenced Appellant to a three-year, non-minimum sentence for felonious assault and a three-year mandatory prison term for the firearm specification, to be served consecutively. This appeal followed.
 {¶ 4} Appellant timely appealed, asserting three assignments of error for review.
 I. ASSIGNMENT OF ERROR I
"APPELLANT'S CONVICTION OF FELONIOUS ASSAULT WITH A FIREARM SPECIFICATION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 5} In his first assignment of error, Appellant contends that his conviction for felonious assault with a firearm specification was against the manifest weight of the evidence. We disagree.
 {¶ 6} As an initial matter, we observe that Appellant has argued in support of this assignment of error that a conviction for possession of cocaine was against the manifest weight of the evidence. We construe this argument as a typographical error and assume that Appellant meant to refer to his conviction for felonious assault as stated in the body of the first assignment of error.
 {¶ 7} When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 8} Appellant was convicted of felonious assault, in violation of R.C. 2903.11(A)(2), which reads, "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." The indictment charged Appellant with having "had a firearm on or about his person or under his control while committing the offense and diplay[ing] the firearm, brandish[ing] the firearm, indicat[ing] that he possessed the firearm, or us[ing] it to facilitate the offense," per R.C. 2941.145(A).
 {¶ 9} Jacqueline Gabriel, the victim in this case, testified regarding the events that took place on March 9, 2005, in her residence in Cuyahoga Falls, Ohio. Ms. Gabriel explained that she met Appellant in 2003 and was dating him at the time the incident occurred and saw him basically every day. She and Appellant even discussed marriage. She also noted that she had a son, Damon, who knew Appellant, spent a lot of time with Appellant, and even called him "daddy." Ms. Gabriel testified, that on the day in question, she had a friend by the name of Mike over to fix her computer. She heard a knock on her door, and then witnessed Appellant kick in the screen door on her front door, unlock the screen door, and come in through the door. Ms. Gabriel explained to Appellant that Mike was just there to fix her computer, but Appellant was not happy that Mike was present. Ms. Gabriel then went to check on Mike, and Appellant followed her in and indicated to Mike that he needed to leave before Appellant killed him. Mike left. Appellant and Ms. Gabriel then started to argue over the matter. Ms. Gabriel left her apartment and went to a friend's house until Damon came home from school, leaving Appellant alone in the apartment.
 {¶ 10} Ms. Gabriel then testified that she eventually returned to her apartment with Damon and that the following events immediately ensued: Ms. Gabriel told Appellant to leave, but he refused. Ms. Gabriel proceeded to her bedroom to lie down. However, Appellant pushed Ms. Gabriel down onto a couch by shoving her face with his hands and told her that he was going to kill her. Ms. Gabriel then escaped into her bedroom, closed and locked the door, and laid down on her bed, her head closest to the wall abutting up against the bed. Appellant kicked open the door to the bedroom, raised a pistol up in the air and hit Ms. Gabriel on her face with the pistol. Appellant, visibly upset, then proceeded to question Ms. Gabriel about any romantic relations between her and Mike. Appellant stated, "[c]an't nobody have you but me." Ms. Gabriel attempted to physically fight Appellant off. Then, Ms. Gabriel observed Appellant shoot at her with the gun; she saw "fire" come out of the pistol and believed that she had been shot. Appellant then left the apartment without saying a word and was taken back to his home by one of Ms. Gabriel's upstairs neighbors, Larry Mullens.
 {¶ 11} Ms. Gabriel then testified, that, after she calmed herself down, she called the police. Ms. Gabriel noted that Damon was with her when she called the police, and that he was "hysterical." The police and the paramedics arrived. Ms. Gabriel gave the police information about Appellant at that point. The paramedics physically examined her, but they did not ultimately take her to the hospital. Pictures taken of Ms. Gabriel's face were admitted as an exhibit at trial. The pictures indicated a wound on her face from Appellant hitting her with the pistol. Other pictures verify that Ms. Gabriel's front screen door was ripped, and that a bullet hole was found in her bedroom wall. Ms. Gabriel also testified that she had previously seen Appellant handle the same gun he used during the incident, both at Appellant's home as well as her own.
 {¶ 12} Damon testified at trial regarding what he witnessed when he came home with Ms. Gabriel. Damon confirmed that Ms. Gabriel asked Appellant to leave; that Appellant pushed her down onto the couch; and that Ms. Gabriel went to her bedroom. Damon testified that he then observed Appellant pull a pistol out of a bag that was in the dining room and proceed to kick open Ms. Gabriel's bedroom door. Damon then moved closer to see what was happening in the bedroom. He saw Appellant point the gun at his mother. Damon then ran upstairs to the Mullens' apartment, where he called his grandmother and told her that Appellant was going to kill Ms. Gabriel. He testified that his grandmother advised him to call the police. Damon ran back downstairs to check on his mother. He then observed Appellant getting into a car with Larry Mullens and drive away. Upon entering their apartment, Damon saw that Ms. Gabriel was alive, but noticed that she was visibly upset, that she kept on feeling her head, and that she kept on repeating that she thought she had been shot. He then saw Ms. Gabriel call 9-1-1. During his testimony, Damon also confirmed that he spent time with Appellant and had such a relationship with him as to call him "Dad." When asked on the stand why his testimony could be believed, Damon explained because he saw the incident and knew what really occurred that day.
 {¶ 13} Police Officer Thomas Savage from the Cuyahoga Falls Police Department testified that he arrived at the scene to find Ms. Gabriel sitting outside her apartment. He examined her head and face, and, after pulling off her wig, determined that she had not been shot. However, he noticed that a portion of the wig looked like it was singed or melted. Upon a sweep of the apartment, Officer Savage noticed a small bullet hole in the wall next to Ms. Gabriel's bed in her bedroom. He discovered a bullet shell casing on the bed. As to Ms. Gabriel's injuries, Officer Savage testified that he noticed bruising, swelling, and a reddened area on her forehead, as well as a cut on her nose.
 {¶ 14} Officer Jeffrey Danes from the Cuyahoga Falls Police Department testified regarding his investigation of the crime scene that evening. He testified that he ripped open the wall around the bullet hole and extracted a fragmented projectile that had fallen into a pocket in the wall.
 {¶ 15} Martin Lewis, a forensic scientist from the Bureau of Criminal Identification and Investigation ("BCI"), testified regarding the gunshot residue collection kits administered on Appellant and Ms. Gabriel. Both kits indicated particles highly indicative of gunshot primer residue on the left and right hands of both Ms. Gabriel and Appellant.
 {¶ 16} Officer Savage also testified as to his search of Appellant's apartment. He stated that he recovered a blue bag from underneath Appellant's mattress, which contained a stainless steel/silver .25 semi-automatic fully-loaded pistol. Another fully-loaded .32 caliber revolver was found underneath a chest of drawers on the floor. During the search, another officer found shotgun shells in an open closet, some .25 semi-automatic cartridges, and miscellaneous cartridges in a chest of drawers.
 {¶ 17} Andrew Chappell from the BCI confirmed from his investigations that the bullet shell casing found on Ms. Gabriel's bed was fired from the .25 semi-automatic pistol found in Appellant's apartment. Furthermore, Mr. Chappell testified within a reasonable degree of scientific certainty that the bullet jacket found in the wall was fired from the same .25 semi-automatic pistol.
 {¶ 18} Officer Michael Gay testified regarding his arrest of Appellant. Officer Gay relayed that Appellant initially denied that the incident ever occurred and that he had guns in his apartment.
 {¶ 19} Detective James Stanley testified that he conducted a tape-recorded interview of Appellant at the police station. Appellant's statement was played for the jury and admitted into evidence. In this statement, Appellant stated that he and Ms. Gabriel used to date, but that they no longer dated. Appellant then admitted that he had planned to marry her. Appellant also denied ever paying Ms. Gabriel for sexual services. As to the day in question, Appellant repeatedly denied ever being at Ms. Gabriel's apartment or shooting at Ms. Gabriel. Appellant insisted that he had not left his apartment that day except to go to the hospital earlier that day to get medication. Appellant even said that he had not been at Ms. Gabriel's apartment since January or February. When Detective Stanley confronted Appellant with Larry Mullens' statement to the police that he gave Appellant a ride that evening, Appellant initially denied knowing Mullens. Appellant then acknowledged knowing him but insisted that he never received a ride from Mullens that evening and that he had been on the phone with his sister at the time the incident allegedly occurred.
 {¶ 20} In addition, Appellant admitted to having access to a Smith and Wesson gun, but repeatedly denied owning or having guns in his apartment. Appellant stated that he last handled and fired a gun about one week ago, but later alluded to having shot the gun that day as well as the day before. Appellant later admitted that it would be possible that the gun shot residue kit may show that he fired the gun that same day. Throughout the interview, Appellant would digress into discussions regarding Ms. Gabriel's alleged criminal history, psychological problems, and drug addiction.
 {¶ 21} Appellant took the stand in his own defense. Appellant insisted that the rendition of the events as he explained in the tape-recorded statement was not an accurate account of the incident and that he had lied to the Detective about the incident and about not having guns in his apartment. Appellant blamed the inconsistency on his embarrassment for being involved in the situation, on his interest in protecting his reputation, and on his attempt to "cover" Ms. Gabriel's "dysfunctions." Appellant also denied having had a romantic relationship with Ms. Gabriel; he characterized the nature of their relationship as a "business arrangement," a "gentleman-lady type of relationship, a favor for favor." However, during cross-examination, Appellant admitted to having more than just a sexual relationship with Ms. Gabriel.
 {¶ 22} Appellant testified that the events transpired as follows: Ms. Gabriel called Appellant around one o'clock in the afternoon and invited him to come to her apartment. Appellant took a cab to Ms. Gabriel's apartment. Upon arriving at Ms. Gabriel's apartment around two o'clock, he saw Ms. Gabriel's upstairs neighbors, Laura and Larry Mullens, and he conversed with them for a while in the parking lot. The three walked towards Ms. Gabriel's apartment. Appellant knocked on the screen door of Ms. Gabriel's apartment, pulled out a key copy that he had, and stuck his hand through the screen that he asserted had already been cut. Appellant and Larry then walked around to the side of the building and knocked on Ms. Gabriel's living room and bedroom windows. Appellant walked back around to the screen door, stuck his hand through the opening, unlocked the screen door, and used his key to unlock the main door. Appellant then pushed the door open and entered the apartment. Ms. Gabriel came running out of the bathroom and invited Appellant to go into her bedroom. Appellant then proceeded to take out his overnight bag, placed his medication in the refrigerator, and started to put on his pajamas. However, at this time Appellant observed a "computer guy" as he called him, come out of the closet. This "computer guy" then said "Stickup, give me your money," apparently holding a gun.
 {¶ 23} Appellant also testified on cross-examination that he observed Ms. Gabriel "going up under the third mattress," and stated that he "kn[e]w that is where the gun is." A struggle ensued between Appellant, Ms. Gabriel, and this man over a .25 automatic handgun, during which Appellant pushed Ms. Gabriel onto her bed. The other man then started to hit Appellant with some sort of weapon (although Appellant could not identify what it was), trying to pull Appellant off Ms. Gabriel. Appellant was trying to pull the gun away from Ms. Gabriel's hands. In the process, the gun accidentally hit Ms. Gabriel on the nose. Appellant and the man fell back on the bed, and the gun discharged. The man then left. Appellant gathered his belongings, including Ms. Gabriel's gun, and also left. Larry, who was waiting for him outside, drove Appellant home. Appellant did not inform Larry of this series of events. When Appellant arrived home, he placed the gun underneath his mattress. Appellant testified that he had been at Ms. Gabriel's apartment for about two to three and one-half hours. Appellant denied ever pointing the gun at Ms. Gabriel or ever attempting to cause physical harm to her.
 {¶ 24} Appellant argues that conflicting testimony was presented regarding the nature of his relationship with Ms. Gabriel and that the jury should have believed his version of the events over that presented by Ms. Gabriel. Appellant also argues that the evidence did not support a finding that the bedroom door was in fact kicked in by Appellant. The jury had before it the testimony of various police officers involved in the investigation, as well as that of the victim, Ms. Gabriel, and an eye-witness. Their testimony was generally consistent. Appellant maintains the hope that one of his two alternative inconsistent stories would have been believed by the fact finder.
 {¶ 25} However, we will not overturn the verdict because the jury chose to rely on certain testimony. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at *2. As the fact finder, the jury was entitled to believe Ms. Gabriel's testimony over that of Appellant. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Moreover, the nature of the relationship between Appellant and Ms. Gabriel does not directly bear on the factual circumstances that gave rise to the charge and conviction.
 {¶ 26} In addition, Appellant argues that the physical evidence does not support the conviction. Specifically, Appellant argues that the fact that gunshot residue was found both on his hands and Ms. Gabriel's hands necessarily indicates that Ms. Gabriel was the perpetrator and the one in control of the gun. However, this is not necessarily the case. As explained by the BCI witnesses, gunshot residue may suggest that a person was in the vicinity when a gun was fired and not necessarily that the person was actually holding the gun at the time.
 {¶ 27} Based upon the foregoing, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice when it found Appellant guilty of felonious assault with a firearm specification. See Otten, 33 Ohio App.3d at 340. Therefore, we conclude that Appellant's conviction for felonious assault with a firearm specification was not against the manifest weight of the evidence.
 {¶ 28} Appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
"WHETHER TRIAL COUNSEL'S REPRESENTATION WAS DEFICIENT AND AFFECTED THE OUTCOME OF THE CASE."
 {¶ 29} In his second assignment of error, Appellant contends that he received ineffective assistance of trial counsel because counsel failed to file a Crim.R. 29 motion for acquittal. We disagree.
 {¶ 30} A criminal defendant is guaranteed a right to the effective assistance of counsel by the Sixth Amendment. SeeMcMann v. Richardson (1970), 397 U.S. 759, 771. A two-step process is employed in determining whether the right to effective counsel has been violated:
"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984),466 U.S. 668, 687.
 {¶ 31} The defendant has the burden of proof and must overcome the strong presumption that counsel's performance was adequate and that counsel's action might be sound trial strategy.State v. Smith (1985), 17 Ohio St.3d 98, 100. In demonstrating prejudice, the defendant must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. In addition, the court must evaluate "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."Strickland, 466 U.S. at 690. "Ultimately, the reviewing court must decide whether, in light of all the circumstances, the challenged act or omission fell outside the wide range of professionally competent assistance." State v. DeNardis (Dec. 29, 1993), 9th Dist. No. 2245, at *2.
 {¶ 32} This Court does not need to address these elements in any particular order; if we conclude that prejudice to the defendant did not result from defense counsel's actions or omissions, then we need not address whether counsel's actions or omissions were actually deficient. See Bradley,42 Ohio St.3d at 143.
 {¶ 33} In this case, the court noted on the record after closing arguments that defense counsel had made a Crim.R. 29 motion at a side bar. However, this side bar was not recorded and transcribed. Therefore, it is not clear whether defense counsel properly brought the motion. See, e.g., State v. Buchanan, 9th Dist. No. 05CA008751, 2006-Ohio-1486, at ¶ 6.
 {¶ 34} Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Sufficiency of the evidence is required to take a case to the jury; therefore, a finding that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2. "Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) Id.
 {¶ 35} We have already determined in Appellant's first assignment of error that his conviction for felonious assault was not against the manifest weight of the evidence. Thus, this determination would be dispositive of the issue of the sufficiency of the evidence regarding the felonious assault charge and would preclude a finding that the conviction for felonious assault was not supported by sufficient evidence. Therefore, Appellant could not have ultimately been prejudiced by trial counsel's failure to properly file a Crim.R. 29 motion in this case, and we find that Appellant has failed to establish ineffective assistance of trial counsel. See Bradley,42 Ohio St.3d at 143.
 {¶ 36} Appellant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III
"WHETHER THE TRIAL COURT'S SENTENCE WAS CONTRARY TO LAW SINCE IT DID NOT TAKE INTO ACCOUNT FUNDAMENTAL SENTENCING PRINCIPLES, EXPRESS SENTENCING CRITERIA, OR MAKE FINDINGS PURSUANT TO OHIO REVISED CODE SECTION 2929.14(B)?"
 {¶ 37} In his third assignment of error, Appellant contends that the trial court's sentence was contrary to law on the basis that the court did not consider and make the requisite findings set forth in R.C. 2929.14(B) when imposing a longer-than-the-minimum sentence on Appellant and maintains that the case should be remanded for re-sentencing. Appellant does not raise a constitutional challenge to R.C. 2929.14(B).
 {¶ 38} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, paragraphs one and two of the syllabus, the Ohio Supreme Court found R.C. 2929.14(B) to be unconstitutional and excised that section from the statute. State v. Dudukovich, 9th Dist. No. 05CA008729, 2006-Ohio-1309, at ¶ 19-20. This Court has construedFoster as having excised R.C. 2953.08(G) for the same reason.Dudukovich at ¶ 20, citing Foster at ¶ 97. Thus, trial courts are no longer required to make the statutory findings listed in R.C. 2929.14(B) for the imposition of consecutive sentences.State v. Windham, 9th Dist. No. 05CA0033, 2006-Ohio-1544, at ¶ 7, citing Dudukovich at ¶ 20. The Court in Foster "grant[ed] trial court judges full discretion to impose sentences within the ranges prescribed by statute." Dudukovich at ¶ 19. Therefore, "`an appellant may not premise error on the alleged procedural deficiencies of the trial court's sentencing entry.'" Id. at ¶ 20, quoting Foster at ¶ 97.
 {¶ 39} Based upon the foregoing, Appellant's third assignment of error lacks merit and is overruled.
 III. {¶ 40} Appellant's first, second, and third assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J. Carr, J. concur.